**BALLARD SPAHR LLP**
Bruce H. Cahn, OSB No. 935450
Nathanael Farris PA, Bar No. 323059, *pro hac vice* to be submitted
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204-3158
Telephone: 503.778.2100
cahnb@ballardspahr.com
farrisn@ballardspahr.com

*Of Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LUMBERJACK, L.P., | Case No. 3:26-cv-00542 |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| CITY OF WILSONVILLE, | |
| Defendant. | |

Plaintiff Lumberjack, L.P. (Lumberjack) alleges:

## I. NATURE OF ACTION

1.      The City of Wilsonville (City) has regulated Lumberjack's big-box retail property (Property) out of all economically beneficial uses.

2.      For years, Lumberjack's tenant, Fry's Electronics (Fry's), operated a big-box electronics retail store at the Property.

3.      In 2019, the City changed the comprehensive plan and the zoning of the Property to encourage walkable, mixed-use development.  Under the new zoning, big-box retail such as Fry's is no longer permitted and Fry's use became lawfully non-conforming.

4.      When Fry's went out of business in 2021, Lumberjack tried to sell or lease the

PAGE 1 - COMPLAINT

#4931-7239-8459 v23/100409.00/00451803

Property, but the only interested parties were either (a) big-box retailers, who could not operate at the Property under the new zoning regulations, or (b) developers who quickly lost interest when they realized redevelopment of the Property was not financially feasible.

5.    After years of unsuccessfully trying to sell or lease the Property, Lumberjack agreed to sell the Property to Home Depot for $23.46 million, contingent on Home Depot getting relief from the new zoning regulations.

6.    Because the new zoning did not permit Home Depot's big-box retail use, Home Depot filed an application for a zoning permit claiming its use was a continuation of Fry's lawful, non-conforming big-box use.

7.    However, the City denied Home Depot's request for a zoning permit, opting to issue what the City's own lawyer called an "extremely narrow" scope of non-conforming use decision. Specifically, the City decided that only an "electronics-related" retail use qualified as a continuation of Fry's lawfully non-conforming use.

8.    Home Depot challenged the City's denial of its lawful non-conforming use all the way to the Oregon Court of Appeals and lost.

9.    Home Depot then terminated the agreement to buy the Property.

10.    In effect, the City's "extremely narrow" non-conforming use decision eliminated all economically beneficial uses of the Property.

11.    The only legal use of the former Fry's building (Building) is for a big-box, electronics-related retailer.  But there are no more big-box, electronics-related retailers.  The only remaining electronics-related retails stores (such as Best Buy or Microcenter) operate much smaller stores (around 40,000 square feet) than the Building, which is over 150,000 square feet.

12.    Likewise, retrofitting the Building for the small-scale retail uses allowed by current zoning is prohibitively expensive.

13.    Even if retrofitting were not cost prohibitive, the market could not bear these additional retail stores, especially because many of them would not enjoy street frontage and other important amenities.

PAGE 2 – COMPLAINT

14.     The City told Lumberjack its regulation of the Property was designed to prevent out-of-state, big-box users.  Instead, the regulations are designed to force redevelopment of the Property as a walkable, mixed-use property.  But there were and are no interested buyers for that use because the cost to develop the Property in that manner dramatically exceeds the potential return.

15.     Indeed, demolishing the Building and constructing the mixed-use neighborhood the City desires is not economically viable because doing so would require rebuilding nearly all the Property's infrastructure, including roads, sewers, utilities, parking, etc.

16.     A very large development would be required to justify these massive infrastructure investments, but there is no market for such a large-scale development.

17.     Suburban office and hotels are not viable uses.  And the market could not absorb the number of housing units needed to justify the infrastructure costs.

18.     In short, because of the City's regulations, the Building is useless, and the Property cannot be redeveloped without losing money.

19.     Lumberjack knows these facts firsthand, because after years of trying to sell, redevelop, or otherwise dispose of the Property, Lumberjack has still been unable to use the Property in any economically beneficial way.

20.     Simply put, absent the City's regulation, the Property was worth at least $23.46 million.  Burdened by those regulations, the Property is economically worthless.

21.     In fact, the Property has negative value.  Lumberjack is continuing to expend millions in carrying costs such as insurance, taxes, and maintenance.  And because Lumberjack has no economically beneficial uses of the Property, Lumberjack has been forced to spend substantial sums to secure the Property and prevent it from becoming blighted.  Despite this, the City has cited Lumberjack for nuisance violations based on the actions of third parties who vandalized the Property.

22.     The City's regulation of the Property amounts to a taking without payment of just compensation, in violation of the Fifth Amendment and Fourteenth Amendments to the United

PAGE 3 – COMPLAINT

States Constitution as well as the Oregon Constitution.

23.     Further, the City's discrimination against out-of-state, big-box retailers violates the Dormant Commerce Clause.

## II. **PARTIES**

24.     Lumberjack, L.P. is a California limited partnership headquartered in San Jose, California.

25.     The City of Wilsonville is an Oregon municipal corporation organized under the laws of Oregon, with a mailing address of 29799 SW Town Center Loop E Wilsonville, OR 97070.

## III. **JURISDICTION AND VENUE**

26.     This action is brought under 42 U.S.C. § 1983, based on Defendant's deprivation of the constitutional rights of Plaintiff under the Fifth and Fourteenth Amendments as well as the Commerce Clause of the United States Constitution.

27.     This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

28.     Jurisdiction is conferred on this Court by 42 U.S.C. § 1983, 42 U.S.C. § 3613(a), 28 U.S.C.§ 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 2201.

29.     A person who has suffered a federal taking may bring a claim in federal court under 42 U.S.C. § 1983.  *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2172 (2019).

30.     This Court has the authority to grant the requested declaratory and injunctive relief and damages under 28 U.S.C. § 2201 and 28 U.S.C. § 1343(a) and 42 U.S.C. § 1983, and to award attorney's fees and costs under 42 U.S.C. § 1988.

31.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (2), because (a) Defendant is located within this District; (b) the events giving rise to Plaintiff's claims occurred in this District; and (c) Plaintiff's Property that is affected by Defendants' wrongful conduct is located in this District.

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

## IV. FACTUAL ALLEGATIONS

**A.      1991-1997: The Property is approved for and developed with big-box retail.**

32.      The Property is approximately 15 acres and is outlined in Figure 1. Its address is 29400 SW Town Center Loop West, Wilsonville, Oregon.



**Figure 1**

33.      In 1991, the City approved the development of a "159,400 square foot retail commercial building" on the Property, which Lumberjack's predecessor then built.[1]

34.      The Building was designed and built to house a single, big-box retail tenant.

35.      At the time the Building was developed, the City's Zoning Code did not distinguish between different types of retail use.

36.      And none of the Property's approvals suggested that the Property's use would be limited to an electronics-related retail store. Indeed, the City issued a Certificate of Occupancy, which simply lists the use as "Retail."

---

[1] A copy of the Approval is attached as Exhibit 1.

PAGE 5 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

**B.**    **1997-2018: Lumberjack acquires the Property and uses it for Fry's big-box electronics store.**

37.    Lumberjack acquired the Property in 1997, and retrofitted it for use as a Fry's Electronics store. Figures 2-3 show what the Property looked like after Lumberjack retrofitted the Building.



**Figure 2**



**Figure 3**

PAGE 6 – COMPLAINT

38.    Lumberjack purchased the Property because it is ideally situated for big-box retail use, given its access to Interstate 5, the major north-south interstate through Portland.

39.    Given this prime location, the area around the Property has been developed with car-dependent retail uses.  As shown in Figure 4, today, nearly all the land around the Property is used for commercial purposes, mostly retail stores with ample surface parking.



Figure 4

40.    None of the neighboring properties are multi-family or mixed-use.

41.    During its due diligence before acquiring the Property, Lumberjack reviewed the approvals and regulations of the Property.

42.    Nothing in those approvals or regulations suggested that the use of the Property would be limited to an electronics-related retail use.

43.    After Lumberjack acquired the Property and finished retrofitting the Building, Fry's began operating its electronics retail store.

44.    Fry's primarily sold consumer electronics such as televisions, computers, video

PAGE 7 – COMPLAINT

BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

games, stereos, etc, but its inventory was not limited to electronics.

45.    Fry's also sold a variety of home and consumer goods such as mattresses, couches, washing machines, refrigerators, and other similar items.  It sold tools and other hardware for home installation of electronics such as electrical wiring, hammers, screwdrivers, and industrial and electrical tape.  It also sold products and components to professionals who installed various electronics systems in homes such as in-home speakers, security systems, and other similar items.

46.    To accommodate this wide variety of products, Fry's stores were much larger than modern electronics retailers such as Best Buy or Micro Center.

47.    Figure 5 shows a typical Fry's interior, which is what the inside of the Building would have looked like when the store was open.



**Figure 5**

48.    In 2014, Fry's operated at least 34 stores across 9 states.

49.    But after decades of successful operations, like most of its competitors *(e.g.* Circuit City), Fry's began to struggle financially with the rise of online shopping.

PAGE 8 – COMPLAINT

C.    **2019: The City makes big-box retail illegal.**

50.    By 2019, Fry's was forced to start closing some of its stores.

51.    While Fry's struggled to survive, the City grew discontent with the Property's use.

52.    The City began to plan a different use for the Property, even though the City did not (and does not) own the Property.

53.    Specifically, the City wanted the Property and surrounding area to develop into a walkable, mixed-use Town Center district—given its proximity to Town Center Park and City Hall, which are approximately 0.3 miles away.

54.    Indeed, the City "engaged in a two-year planning process with the City staff to establish a new vision for the Wilsonville Town Center." Ex. 2 at 2.[2]

55.    The City convened a task force to study the Town Center concept. Ex. 3 at 3.[3]

56.    The City staff and Planning Commission were deeply involved in preparing the Town Center Plan. *Id.*

57.    The City hired consultants to help prepare the Town Center Plan. *Id.*

58.    The Plan was developed over multiple years, with input taken by meetings, surveys, "open houses, workshops, and industry leader presentations . . . . This resulted in thousands of touchpoints with the community." *Id.* at 5.

59.    The goal of the Town Center Plan was "to transform Wilsonville's Town Center into a vibrant, walkable destination that inspires people to come together and socialize, shop, live, and work." *Id.*

60.    An integral part of the Town Center Plan was major changes to the City Zoning Code, which make it illegal for a single tenant to use the whole Building even though that is how the Building was designed, built, and historically used.

61.    The City Council considered the Town Center Plan at many public meetings.

---

[2] A copy of the Staff Report on DRB Resolution 429 is attached as Exhibit 2.

[3] A copy of the full Town Center Plan is attached as Exhibit 3. (Adopted Ord. No. 835 (May 6, 2019), amended by Ord. No. 850 (Oct. 18, 2021)).

PAGE 9 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

62.     Ultimately, in 2019, the City Council adopted the Town Center Plan, which included significant changes to the City's Comprehensive Plan and Zoning Code.

63.     As shown in Figure 6, the Property was placed in the TC Zone, and it spans three



**Figure 6**

different sub-districts within that zone: Commercial-Mixed Use (C-MU), Main Street District (MSD), and Mixed Use (MU).

64.     Under these new zoning designations, retail stores cannot be larger than 30,000 square feet. Wilsonville, Or. Code § 4.132(.02)(F) (2019).

65.     The new changes also introduced several regulations designed to require walkable development, as opposed to the car-dependent current uses. *Id.* § 4.132.

66.     Because Fry's use violated the changes to the Zoning Code, the Property and its use became lawfully non-conforming on June 5, 2019—the effective date of Ordinance No. 835.

67.     Likewise, the Building, which is approximately 159,000 square feet, became legally non-conforming.

**D.     2020-2021: Fry's closes and the City pushes Lumberjack to demolish the Building.**

68.     In March 2020, the COVID-19 shutdown orders forced Fry's to close its doors.

PAGE 10 – COMPLAINT

BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

Given its previous financial struggles, Lumberjack suspected Fry's would not re-open.

69.    Lumberjack began searching for a viable use of the Property.

70.    Lumberjack started marketing the Property for sale and lease.  But the City's Town Center Plan and attendant Zoning Code changes made it impossible for Lumberjack to find a buyer, tenant, user, or a joint venture partner to redevelop the Property.

71.    Fundamentally, the Town Center Plan and Zoning Code changes made illegal the use for which the Property was designed, developed, and historically used—*i.e.*, as big-box retail.

72.    The Building is much larger than most retail buildings, so there are limited number of potential tenants of the Building.  Only very large, big-box retailers such as home centers (*e.g.*, Home Depot, Lowe's, and Menards), supercenters (*e.g.,* Target and Wal-Mart), or wholesale clubs (*e.g.,* Sam's, Costco, BJ's) will lease a space as large as the Building.

73.    And the new regulations make it illegal for any of those big-box retailers to use the Building.

### 1.    Redevelopment of the Property as a walkable, mixed-use neighborhood is not financially feasible.

74.    Because the City's new zoning regulations were making it impossible to use the Property, Lumberjack approached the City to see if there was any possibility of putting the Property back into use.

PAGE 11 – COMPLAINT

BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

75.     After some initial conversations, the City's Director of Economic Development, Jordan Vance, sent Lumberjack a concept plan for the Property (Figure 7), which the City believed was "consistent with the community's vision for the future Town Center area." Ex. 4 at 5.[4]

76.     The concept plan, shown in Figure 7, calls for the development of almost 500,000



**Figure 7**

square feet of mixed-use buildings, including two new office buildings, a hotel, two new residential buildings with around 480 new units, and a parking garage.

----

[4] A copy of an E-mail chain from city staff is attached as Exhibit 4.

BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

77.    Consistent with the concept plan, Figure 8 is a comparison of two images in the Town Center Plan.  On the top is the existing conditions in 2019.  On the bottom is what the Plan calls for the area to look like in 20(+) years.  The red circle is roughly where the Property is.



**Figure 8**

BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

78.     In the second picture, the Building and most of the parking lot have been demolished and replaced with multiple buildings, a new street grid, a parking garage, and public green space.

79.     Figures 7 and 8 demonstrate that the City changed the Property's zoning regulations to force redevelopment as a mixed-use walkable neighborhood.

80.     But the redevelopment contemplated by the Town Center Plan and concept plan (or anything like them) is not feasible.

81.     To start, the Property (and many other properties within the Town Center Area) is burdened by a Planned Business Community Declaration (Declaration),[5] which prohibits many of the uses contemplated in the Town Center Plan (such as hotels).  Ex. 5 at 12 (prohibiting hotels) & 15 (subjecting non-business uses like apartments to approval by the Declarant).  The Declaration also prohibits many of the design features in the Town Center Plan, such as on-street parking.  *Id.* at 9.  And, under the Declaration, all new improvements are subject to approval by the Declarant. *Id.* 7-8.

82.     Even the City has acknowledged that the Declaration impedes the developments envisioned by the Town Center Plan, and has asked the owners to either amend or remove the Declaration.  But the Declaration remains in effect and continues to prevent the City's preferred development.

83.     Even if the Declaration did not prevent the type of developments the City wants, building anything approaching what is pictured in Figures 7-8 requires reworking the entire infrastructure of the Property, at enormous cost to any developer.

84.     Indeed, the Town Center Plan imposes a new street grid on the Property, with new roads intersecting in the middle of what is now the Building.  *See* fig. 9.  This new street grid was codified when the Town Center Plan was adopted.    Wilsonville, Or. Zoning Code § 4.132(.04)(A)("All development will be consistent with the Street Network . . . shown in Figure

---

[5] A copy of the Declaration is attached as Exhibit 5.

PAGE 14 – COMPLAINT

2[.]") (2019).



Figure 9 (callout added)

85.    The Plan (and related changes to the Zoning Code) assumes that "the private developer" will pay for "the cost of these [new] local roads." Ex. 3 at 68. But the Plan does not say how much those new roads will cost. Ex. 3 at 105 (listing costs of new local road network as "N/A").

86.    The Town Center Plan also calls for re-routing the existing sewer, stormwater, and utilities through what is currently the Building. Ex. 3 at 50, 52, 54. For example, Figure 10 shows how the Plan would change the sewer.



Figure 10

87.    And again, the Plan envisions that the $47.7 million cost to build the infrastructure will be born, at least in part, by private developers. Ex. 3 at 106 (estimating cost for water, sewer, and stormwater infrastructure at $47.4M).

PAGE 15 – COMPLAINT

88.    The Plan even assumes that private developers will build parks on what is currently private land and then donate them to the City.  The Plan calls for a "Promenade," which is a "linear park located north of the existing Building. Ex. 3 at 69; s*ee* fig. 11.



**Figure 11**

89.    The City recognized that the Promenade would cost at least $1.8 million.  *Id.* at 72. Under the Plan, the "Promenade is assumed to be constructed, in whole or in part, by private development." *Id.*

90.    Since the Plan was passed, no new mixed-use buildings have been built within the Plan area.  Nor have any new roads or other infrastructure been built.

91.    This lack of development is unsurprising given the substantial infrastructure costs required to build anything like what the City envisions in the Town Center Plan.

92.    The lack of development since the Town Center Plan and Zoning Code changes were adopted incontrovertibly establishes that redevelopment was not and is not economically viable.

PAGE 16 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

93.     Indeed, the Plan Area looks nearly the same today as it did when the Plan was passed in 2019.  *See* fig. 12.

 

**Figure 12**

94.     Even though the City's plans for the Property are not feasible, on July 30, 2020, several Lumberjack representatives met with City Manager Bryan Cosgrove, Community Development Director Chris Neamtzu, and Planning Director Miranda Bateschell to discuss the concept plan.

95.     At that meeting the City Manager told Lumberjack the City did not want any out-of-state, big-box retailers to use the Property.  The City Manager explained that the Town Center Plan was passed in part to prevent large, national retailers such as Fry's or Home Depot from using the Property.

96.     At the meeting, the City did not provide Lumberjack with information about developers or buyers who would be willing to undertake the financial risk associated with developing something like the concept plan.

PAGE 17 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

97.    To date, the City has not identified a buyer or developer willing to purchase the Property to redevelop, nor has Lumberjack found anyone who believes that anything like the concept plan is viable.

98.    The lack of interest from buyers or developers is unsurprising because developments like the City's concept plan—or anything like what is contemplated in the Town Center Plan—are not economically feasible on their face.

99.    To start, each relies on building a parking garage, which is not typical in the area and is prohibitively expensive.  Indeed, there are no parking garages anywhere in Wilsonville.

100.    Moreover, both the concept plan and the Town Center Plan call for building several 5-story office buildings.  But since COVID, the suburban office market has disappeared.  There are not any 5-story office buildings in Wilsonville today; nor have there ever been.  Moreover, there has not been any ground up development of suburban office buildings anywhere in the Portland area since COVID.  In short, office is not an economically viable use for the Property.

101.    Likewise, the concept plan calls for development of a hotel; but there is not sufficient demand in the area for a hotel—and that use is prohibited by the Declaration.

102.    Nor is there sufficient demand for the apartment buildings the City wants, which is why no such buildings have been developed since the Town Center Plan was adopted.

103.    Indeed, there is no such market today; nor has there been since 2019.  This market does not exist because the costs to demolition the Building, build the new infrastructure required, and develop the large, mixed-use buildings the City wants exceed any potential return.  Such a development is too risky, which is why no such developments have been built within the Town Center area since 2019.

104.    The Town Center Plan itself acknowledges the lack of a market for large-scale redevelopment: "some desired development types are not currently feasible." Ex. 3 at 37.  In fact, under the Plan, many of the buildings-types shown in the City's concept plan *will not be feasible for 20(+) years*, if ever. *Id.* at 39 (explaining that after "[f]ull [b]uildout [b]eyond 20 [y]ears" the "five-story mixed-use and office products" like the ones in the City's concept plan "could be

PAGE 18 – COMPLAINT

feasible").

105.    Even if a buyer were willing to take the risk of large-scale redevelopment, a bank would not be.  It would be difficult, if not impossible, to obtain construction financing for such a project.

106.    As such, at no point since the Town Center Plan was passed has a mixed-use project like the City wants been feasible.

**2.    Renovating the Building to be code-compliant is not economically viable.**

107.    After meeting with the City, Lumberjack investigated the possibility of renovating the Building to make it comply with the new Zoning Code changes.

108.    Based on its experience renovating similar buildings across the country, Lumberjack determined that it would cost far more to divide the Building into many 30,000 sq. ft. or smaller retail stores than Lumberjack could ever realize in return for leasing or selling those stores.

109.    Each new tenant would require its own utilities, plumbing, HVAC systems, bathroom facilities, loading docks, and entrances.

110.    Making these renovations would cost millions of dollars.

111.    Given prevailing rents, these renovations were and remain cost prohibitive.

112.    Even if renovating the Building were not cost prohibitive, market data shows it was unlikely that there were (or are) enough tenants to occupy those newly renovated spaces.

113.    Moreover, if the Building were divided into new 30,000 square foot or smaller stores, many of those new storefronts would not face the front of the Building or the entrance of the Property.  These storefronts would be less desirable to potential tenants because they lack visibility and are harder for customers to find.  These stores would therefore fetch below-market rents given their inferior attributes.

114.    For all of these reasons, no buyer or tenant was interested in retrofitting the Building to make it comply with the Town Center Plan's new zoning requirements.

PAGE 19 – COMPLAINT

115.    The only interested users were (and are) big-box retailers, which is not allowed under the Plan's changes to the Zoning Code.

116.    In February 2021, Fry's officially closed its remaining stores, including the Property.

117.    The Property has sat vacant since then.

**E.    2023: Home Depot wants to use the Property, contingent on zoning.**

118.    Despite the dire financial outlook for the Property caused by the City's regulations, Lumberjack continued to market the Property and look for a way to bring it back into use.

119.    In 2023, Home Depot expressed interest in using the entire Building to operate one of its home improvement stores.

120.    Initially, Home Depot wished to lease the Property, but after conducting some diligence, decided it preferred to purchase the Property.

121.    After a lengthy negotiation, on March 26, 2024, Home Depot agreed to purchase the Property for $23,460,000, contingent on Home Depot obtaining approval to operate, including "a determination from any applicable governmental agencies that a non-conformance use at the Property is permitted[.]" Ex. 6 at 1, 7.[6]

122.    Even before it signed the purchase agreement, Home Depot (with Lumberjack's permission) had begun trying to get approval to operate on the Property.  To that end, in the fall of 2023, Home Depot submitted two applications to the City.

123.    The first application asked for confirmation that the Fry's use and the Building were lawfully non-conforming to the Town Center Plan's new zoning regulations (Non-Conforming Application).[7]

124.    The second application asked for confirmation that use of the Property as a Home

---

[6] A copy of the Purchase Agreement is attached as Exhibit 6.

[7] A copy of that Nov. 28, 2023 Application is attached as Exhibit 7.

PAGE 20 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

Depot would be a continuation of the lawful non-conforming use (Continuation Application).[8]

### F.    2024: The City limits the Building's use to electronics-related retail.

125.    The City Planning Director decided the Non-Conforming Application, and referred the Continuation Application to the Development Review Board (DRB).

126.    On the Non-Conforming Application, the Planning Director determined "that Fry's Electronics . . . is a legally established Non-Conforming Use in a Non-Conforming Structure with Non-Conforming Site Conditions in the TC zone."  Ex. 9 at 3-4.[9]

127.    Home Depot appealed the Non-Conforming decision to the DRB, and the DRB then held hearings on both Applications.  At the DRB hearing, Home Depot presented evidence that its use was substantially the same as Fry's, including photos (some of which are in Figure 13), showing how similar the products and layout of Fry's and Home Depot are.

 

 

**Figure 13**

**Fry's (left)**

**Home Depot (right)**

---

[8] A copy of that Oct. 30, 2023Application is attached as Exhibit 8.
[9] A copy of the Class 1 Review Decision is attached as Exhibit 9.

PAGE 21 – COMPLAINT

128.    The following chart, presented to the DRB, summarizes the evidence presented showing the ways in which Fry's and Home Depot's use are the substantially the same:

**Continuation of Use – Commercial Retail**

| Consumer Products Offered | Previous Retail Use | Proposed Retail Use |
|---|---|---|
| • Appliances | ✓ | ✓ |
| • Tools | ✓ | ✓ |
| • Measurement Equipment | ✓ | ✓ |
| • Technical Expertise | ✓ | ✓ |
| • Service | ✓ | ✓ |
| • Delivery Options | ✓ | ✓ |
| • Ancillary Sales (Snacks, etc.) | ✓ | ✓ |
| • Marketed to Professionals | ✓ | ✓ |

Figure 14

129.    The DRB refused to credit this evidence.  Instead, it found that the non-conforming use was limited to an "electronics-related retail store."[10]  The DRB also decided that Home Depot's proposed use **would not** be a continuation of the non-conforming use because Home Depot was not an "electronics-related" retail store."[11]

130.    Home Depot appealed both decisions to City Council.  It presented the same evidence showing that Home Depot's use was substantially the same as Fry's and therefore should be considered a continuation of the non-conforming use.

131.    The City Council also rejected Home Depot's evidence and affirmed both DRB decisions.[12]

---

[10] A copy of Resolution 429 is attached as Exhibit 10.
[11] A copy of Resolution 432 is attached as Exhibit 11.
[12] A copy of the City Council Resolution affirming the Continuation Application decision is attached as Exhibit 12.  A copy of the City Council Resolution affirming the Non-Conforming Use Application decision is attached as Exhibit 13.

PAGE 22 – COMPLAINT

132.    Specifically, City Council adopted the staff's recommendation that a continuation of use would be limited to an "electronics-related retail store," which "is not the same as" Home Depot's proposed "home improvement warehouse store[.]"

133.    The staff report—which City Council adopted—relied in turn on the advice of City attorney Stephanie Davidson.  Ms. Davidson prepared a memorandum recommending that City Council affirm the DRB DB24-0002 decision.[13]  Ms. Davidson advised that "non-conforming uses are disfavored and local government has discretion to establish *extremely narrow* scope of use." Ex. 14 at 8.

134.    Home Depot appealed both City Council decisions to the Land Use Review Board (LUBA).  The cases were consolidated on appeal, and LUBA affirmed both decisions.  LUBA refused to "reweigh the evidence," holding that the City "did not err in concluding" that Home Depot's "proposed use is not a continuation of the verified nonconforming use." Ex. 15 at 12.[14]

135.    Home Depot then appealed the LUBA decision to the Oregon Court of Appeals, and the Oregon Court of Appeals affirmed the LUBA decision without an opinion on January 2, 2025.[15]

136.    Home Depot did not appeal further, and the decisions are now final.

**G.    2025: Home Depot pulls out of the deal; the Property sits vacant and unusable.**

137.    After it lost before the Oregon Court of Appeals, Home Depot terminated the agreement of sale.

138.    Lumberjack resumed its efforts to sell or lease the Property.

139.    However, because of the Town Center Plan's new regulations and the City's "extremely narrow" scope of use determination (which was upheld by the Courts), only a big-box, electronic-related retail store can occupy the Building.

140.    Unfortunately, there are no electronic-related retail stores interested in leasing or

---

[13] A copy of the Memorandum is attached as Exhibit 14.

[14] A copy of the Land Use Review Board Order and Opinion is attached as Exhibit 15.

[15] A copy of the Order from the Oregon Court of Appeals is attached as Exhibit 16.

PAGE 23 – COMPLAINT

buying the Building.

141. Like Fry's, most big-box, electronics retail stores have gone out of business as consumers bought more and more electronics online.

142. The largest remaining national electronics retailer are Best Buy and Micro Center. Neither is interested in the Building because it is larger than those companies prefer their stores to be—*i.e.*, around 40,000 square feet.

143. In short, the "extremely narrow" scope of the non-conforming use is illusory. There are no electronics-related retailers that want to use the Building.

144. Likewise, after years of trying to sell the Property, no buyers have expressed serious interest in acquiring the Property for any uses that would comply with the Town Center Plan's regulations.

145. As such, the City's regulation of the Property has eliminated any economically beneficial use of the Property.

146. As the Property has sat vacant, it has begun to deteriorate.

PAGE 24 – COMPLAINT

147.    As shown in Figures 15-16, there have been several break-ins. *See* fig. 15.  Copper wiring and piping have been stolen.  *See* fig. 16.  People have camped and even tried to live in the





**Figure 15**                                    **Figure 16**

vacant Building.  And water is beginning to infiltrate the Building.  Fig. 17



**Figure 17**

PAGE 25 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

148.    Lumberjack has taken all the precautions it can to prevent the Property from becoming a public danger or nuisance.  Lumberjack has secured the perimeter of Property with fencing and boarded up the exterior of the Building.  *See* fig. 18.




**Figure 18**                                              **Figure 19**

149.    It has 24/7 video surveillance of the property, which warns trespassers to leave the Property. *See* fig. 19.  This surveillance device alerts Lumberjack's security team, who is available to respond if/when the surveillance shows that someone is trespassing.

150.    However, the longer the Property sits vacant, the worse these conditions become.

151.    Further, securing the Property has cost, and continues to cost, Lumberjack significant sums of money.

152.    Because it has no economically viable use of the Property available, Lumberjack is losing money every day the Property remains subject to the Town Center Plan's new regulations.

153.    Since Fry's closed in 2021, Lumberjack has spent more than $3,400,000 in carrying costs for the Property.  These costs include: taxes, insurance, security, maintenance, repairs, utilities, and other related costs.

154.    Lumberjack has not earned any money from the Property since Fry's closed.

PAGE 26 – COMPLAINT

155.    In sum, the City wants the Building demolished and replaced with a series of walkable, mixed-use buildings.  It made changes to its comprehensive plan and Zoning Code to allow that sort of development, which was previously not permitted.

156.    Seven years later, the market has proven that the walkable, mixed-use redevelopment the City wants is not financially feasible.  Nor is retrofitting the Building for smaller scale retail use.

157.    But the City also prohibited big-box retail use and limited the Property to electronic-related retail use.  In doing so, it made all economically viable uses of the Property illegal.

158.    In short, there is no hope of putting the Property to an economically beneficial use until either the market drastically changes or the City's regulations of the Property are changed.

## V. **CLAIMS**

**A.    Count 1: Taking of the Property without payment of just compensation in violation of the Fifth and Fourteenth Amendments (42 U.S.C. § 1983)**

159.    Lumberjack incorporates by reference paragraphs 1 through 158 above.

160.    The Fifth Amendment to the United States Constitution prohibits the government from taking "private property . . . for public use, without [paying] just compensation."  U.S. Const. amend. V.

161.    The Fifth Amendment's Just Compensation Clause is incorporated against the States (including their political subdivisions such as cities) through the Fourteenth Amendment. *See Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 241 (1897); *State By & Through Dep't of Transp. v. Hewett Prof'l Grp.*, 321 Or. 118, 131, 895 P.2d 755, 763 (1995).

162.    Courts have long recognized that when a government regulation goes "too far," it amounts to a taking of private property without payment of just compensation in violation of the Fifth Amendment.  *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

163.    Here, the City has gone too far.  It has regulated the Property out of any economically beneficial use, which the Supreme Court has recognized is a categorical taking.

PAGE 27 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) ("The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land.").

164.    Even if the regulations are not a categorical taking under *Lucas,* the City's regulation of the Property fails the three-part test for when a regulation goes "too far" and is thus a taking under *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 123-24 (1978).

### 1.    Deprivation of All Economically Viable Uses (*Lucas*)

165.    In *Lucas*, the Supreme Court held that "as we have said on numerous occasions" the "Fifth Amendment is violated when a land-use regulation . . . *denies an owner economically viable use of his land*." *Lucas*, 505 U.S. at 1016 (quoting *Agins v. City of Tiburon*, 477 U.S. 255, 260 (1980)) (internal quotation marks omitted) (emphasis in original).

166.    Here, the economically viable uses of the Property—such as Home Depot—are prohibited by the Town Center Plan's zoning changes and the City's admittedly "extremely narrow" definition of the non-conforming use as "electronics-related" retail.

167.    And none of the legal uses are economically viable.

168.    Of few remaining electronics-related stores, none wants to use the Property because the Building is much larger than those stores.

169.    Retrofitting the Building is not viable.  It would cost more to reconfigure the Building into 30,000 square foot or smaller stores than could be recouped under current market rents.  Even if renovations were not cost prohibitive, there are not enough tenants to lease all the spaces.

170.    Nor is redevelopment or sale the Property feasible because the market will not bear the costs to develop the limited types of use that are permitted under the Towns Center Plan.

171.    Lumberjack cannot even sell the land under the Building because the cost to demolish the Building and redevelop the Property with code-compliant uses exceeds any potential return.

172.    In fact, the Property currently has a negative value in that it costs Lumberjack far

PAGE 28 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

more to carry the Property than it can generate given the City's regulations.

173.    Put differently, Lumberjack could not give the Property away because it would be a liability to any future owner.

174.    The City's land-use regulations of the Property have made it impossible to use the Property today in any economically beneficial way.  Indeed, the City's own feasibility studies show it will be at least 20 years until the walkable, mixed-use buildings it desires will be economically feasible.

175.    Lumberjack's only option is to wait and hope that redevelopment becomes feasible at some point in the future.

176.    Under *Lucas,* forcing an owner to hold the land unproductive is a categorical taking for which the City must pay Lumberjack just compensation.  *DM Arbor Court, Limited v. City of Houston*, 150 F.4th 418, 423 (5th Cir. 2025) ("Saying that a property's only remaining use is to hope for future development is the same as saying that the property must remain idle today.  That is a categorical taking under *Lucas.*"); *see also Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374 (Fed. Cir. 2000) (holding that denial of a permit for dredging and filling was a categorical taking); *Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 486 (Ct. Fed. Clms. 2009); ("*Lucas* thus focuses on whether a regulation permits *economically viable use* of the property, not whether the property retains some value on paper.").

### *2.*    **Regulatory Taking (*Penn Central*)**

177.    Even if they are not a categorical taking, the City's regulations still amount to a taking under the three-part test in *Penn Central*.

178.    Under that test, courts weigh three factors to decide whether a regulation amounts to a taking: (1) economic impact of the regulation on the property; (2) the degree to which the regulation interferes with the owner's investment backed expectations; and (3) the character of the government interference.

179.    The *Penn Central* test is an *ad hoc* factual inquiry, in which the first two factors are generally given greater weight.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538-39 (2005).

PAGE 29 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

180.    Here, all three factors cut in Lumberjack's favor.

181.    *Economic Impact.* Courts measure the economic impact by comparing the property's value before and after the regulation went into effect. *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 631 (9th Cir. 2020).

182.    Here, the City's regulation has eroded the Property's value by at least 95%.

183.    Absent the City's regulation, the Property was worth at least $23.46 million—the price two sophisticated parties (Lumberjack and Home Depot) agreed to after an arms-length negotiation.

184.    In other words, had the City determined that Home Depot was a continuation of the non-conforming use, the Property would have sold for $23.46 million.

185.    After it refused Home Depot's Continuation Application, the only "value" left in the Property is a nominal, non-economic remainder.

186.    By any metric, a 95%(+) loss of value cuts in favor of the owner under the first *Penn Central* factor.

187.    *Investment Backed Expectations.* The second *Penn Central* factor also favors Lumberjack because the Town Center Plan and the City's non-conforming use decisions interfere with Lumberjack's reasonable investment-backed expectations that it could use the Building for big-box retail.

188.    An owner's investment-backed expectations are reasonable when the regulation was not foreseeable at the time the owner made the investment. *Cienega v. U.S.*, 331 F.3d 1319, 1346 (Fed. Cir. 2003) ("This is an objective, but fact-specific inquiry into what, under all the circumstances, the Owners should have anticipated.").

189.    Lumberjack's expectations were reasonable because when it bought the Property and redeveloped the Building, no reasonable market participant could have foreseen the City's "extremely narrow" non-conforming use determination.

190.    Even if a change in zoning might have been foreseeable, the City's "extremely narrow" non-conforming use decision was not.

PAGE 30 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

191.    That decision was not foreseeable because it is out of keeping with how the City has historically regulated the Property. Nothing in the Property's original approvals suggested that the Building's use could be limited to electronics-related retail.

192.    Nor did anything in the Town Center Plan suggest that the non-conforming use would be so narrowly defined. For example, the City's Development Code does not include a definition or category limited to "electronics-related" retail use.

193.    Nor is it common for non-conforming uses to be construed so narrowly.

194.    For all of these reasons, when Lumberjack bought the Property and retrofitted the Building, no reasonable market participant could have foreseen that the Building's use would be limited to an electronics-related retail store.

195.    As such, the second prong of the *Penn Central* test favors Lumberjack.

196.    *Character of the Government Action.* Under the final prong of the *Penn Central* test, courts "should seek to 'identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain.'" *Blackburn v. Dare Cnty.*, 58 F.4th 807, 814 (4th Cir. 2023) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005)).

197.    Likewise, courts "should consider the distributional impact of the order. All else being equal, a regulation is more problematic when it burdens only a small number of property owners." *Blackburn*, 58 F.4th at 814 (citing *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

198.    Here, the Town Center Plan and attendant regulations disproportionately affect Lumberjack.

199.    The Building is the largest in the Town Center zone, and one of the few retail stores greater than 30,000 square feet. As such, it was one of only a few buildings made legally non-conforming by the adoption of the Town Center Plan and attendant zoning changes.

200.    What's more, no other property owner in the Town Center zone has been limited to an "extremely narrow" use like electronics-related retail.

201.    Nor has any other building in the Town Center zone been rendered unusable by

PAGE 31 – COMPLAINT

BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

non-conforming use decisions and the Town Center Plan.

202. In short, Lumberjack bears an unequal share of the burden imposed by the City's policy choice to implement the Town Center Plan.

203. Worse, the City's motive for imposing these regulations was at least in part to prohibit out-of-state companies such as Fry's or Home Depot from using the Property, as it told Lumberjack.

204. The City has made no secret of its desire that the Building be demolished, even though absent the City's regulations, the Building is economically viable as a big-box store.

205. While the City's policy aim of creating a walkable, mixed-use town center may be laudable, it has forced Lumberjack to bear most, if not all, the cost imposed by that policy choice.

206. Given the targeted nature of the regulations, their unusually restrictive definition of retail sales, and the unequal distribution of benefits and burdens, the third prong favors Lumberjack.

207. Since all prongs favor Lumberjack, the City has unlawfully taken the Property under *Penn Central*.

**B.    Count 2: Taking of the Property without payment of just compensation in violation of the Oregon Constitution**

208. Lumberjack incorporates by reference paragraphs 1 through 207 above.

209. Even if the City's regulations are not a taking of the Property under Federal law, they are under Oregon law.

210. Like the Federal Constitution, Article 1, Section 18 of the Oregon Constitution provides that "[p]rivate property shall not be taken for public use . . . without just compensation[.]"

211. But, under Oregon law, "[a]ny destruction, restriction, or interruption of the common and necessary use and enjoyment of the property of a person for a public purpose constitutes a 'taking' thereof." *Hawkins v. City of La Grande*, 843 P.2d 400, 406 (Or. 1992).

212. This inverse condemnation inquiry "boils down to" whether "there has been a 'substantial' interference with property rights." *Id.*; *see also Vokoun v. City of Lake Oswego*, 56

PAGE 32 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

P.3d 396, (Or. 2002) ("To establish a taking by inverse condemnation, the plaintiff is not required to show that the governmental defendant deprived the plaintiff of all use and enjoyment of the property at issue. . . . . A 'substantial interference' with the use and enjoyment of property is sufficient.") (internal quotations and citations omitted).

213.    Here, Lumberjack's use of the land has been almost, if not totally, prohibited.

214.    The Building cannot be used for big-box retail; nor can it be retrofitted for smaller retail uses. And, according to the City, there is no prospect of redevelopment of the Property in the next 20 years. Ex. 3 at 39.

215.    As such, the Town Center Plan and the non-conforming use decisions substantially interfere with Lumberjack's ability to use its land.

216.    Thus, under Oregon law, the City has taken Lumberjack's Property and must pay just compensation.

**C.    Count 3: Burden on interstate commerce in Violation of the Dormant Commerce Clause (42 U.S.C. § 1983)**

217.    Lumberjack incorporates by reference paragraphs 1 through 216 above.

218.    The Town Center Plan and the non-conforming use decisions violate the Dormant Commerce Clause.

219.    By the City's own admission, these regulations were designed to stop out-of-state businesses from using the Property.

220.    Under "what has come to be called the dormant Commerce Clause" states are generally prohibited from "economic protectionism." *Dept. of Rev. of Kentucky v. Davis*, 553 U.S. 328, 337 (2008) (internal quotations and citations removed).

221.    "In considering whether a state law violates the dormant Commerce Clause, the inquiry is twofold: a court considers first whether 'heightened scrutiny' applies, and, if not, then considers whether the law is invalid under the *Pike* balancing test."    *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Marketing Bd.*, 462 F.3d 249, 261 (3d Cir. 2006).

222.    Heightened    scrutiny    applies    when    a    law    "'discriminates    against    interstate

PAGE 33 – COMPLAINT

**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OR 97204-3158
TELEPHONE: 503.778.2100
FAX:503.778.2200

commerce' in its purpose or effect." *Id.* (quoting *C & A Carbone, Inc. v. Town of Clarkson*, 511 U.S. 383, 390 (1994)).

223.    Where the "object [of the law] is local economic protectionism," heightened scrutiny applies. *Carbone*, 511 U.S. at 390. It does not matter if the law also burdens some in-state businesses. *Id.* at 391 ("The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition.").

224.    When heightened scrutiny applies, the "law is 'virtually *per se* invalid'[.]" *Davis*, 553 U.S. at 338 (quoting *Oregon Waste Systems, Inc. v. Dept. of Envt'l Quality of Oregon*, 511 U.S. 93, 101 (1994); *see also Nationwide Biweekly Admn., Inc. v. Owen*, 873 F.3d 716, 736 (9th Cir. 2017) ("[I]n all but the narrowest circumstances, state laws violate the [Dormant] Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'") (quoting *Granholm v. Heald*, 544 U.S. 460, 472 (2005)).

225.    Here, the Town Center Plan "focuses on attracting and retaining **local** businesses . . . ." Ex. 3 at 9 (emphasis added).

226.    And the City told Lumberjack it does not want national retailers such as Home Depot to occupy the Building.

227.    As such, the Town Center Plan and the non-conforming use decisions are a targeted set of regulations designed to discriminate against out-of-state, big-box retailers. *See Nationwide*, 873 F.3d at 736 (holding that California law "discriminates on its face against out-of-state economic interests" by conditioning licensure on being incorporated in the state).

228.    So, heightened scrutiny applies, and these regulations are a violation of the Dormant Commerce Clause.

229.    Even if heightened scrutiny does not apply, these regulations impose an excessive burden on interstate commerce.

230.    Where heightened scrutiny does not apply, "the law 'will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local

PAGE 34 – COMPLAINT

benefits.'" *Pike v. Bruce Church*, *Inc.*, 397 U.S. 137, 142 (U.S. 1970).

231.    Courts employ a balancing test to decide when a burden on interstate commerce is excessive. *Id.*

232.    The Town Center Plan, Continuation Decision, and the Non-Conforming Decision impose a legally prohibited straitjacket on Lumberjack.

233.    There is no economically feasible way to develop Plan-compliant uses.

234.    The only realistic users of the Building are big-box retailers. And the vast majority of big-box retailers are out-of-state chains that rely on easy interstate access such as the Property enjoys to move goods efficiently and economically.

235.    The regulations make it impossible for one of these out-of-state retailers to use the Property.

236.    It would cost Lumberjack an inordinate amount of money to comply with the regulations.

237.    Finally, it is not clear what the City's countervailing interest is.

238.    The City may well have good reasons to want the Property to develop as a walkable mixed-use neighborhood.

239.    But given that even its own studies show that will not be possible in the next 20 years, the City gains no benefit from the regulations.

240.    If anything, the City is harmed by having a large, vacant building decaying in the middle of its planned Town Center.

241.    For all these reasons, the City's regulation of the Property places an excessive burden on out-of-state, big-box retailers.

242.    As such, the City's regulations violate the Dormant Commerce Clause.

## **PRAYER FOR RELIEF**

Based on the foregoing, Lumberjack requests the following relief:

1.    A finding that the City has taken the Property without payment of just compensation in violation of the Fifth Amendment to the United Stated and/or Article I, Section 18 of the Oregon

PAGE 35 – COMPLAINT

Constitution;

2.      An award of just compensation (including all damages such as carrying costs) for inverse condemnation under 42 U.S.C. § 1983 and/or the Oregon Constitution;

3.      In the alternative to a finding that there has been a taking, a declaration that the Town Center Plan and the City's decisions regarding non-conforming use of the Property interfere with interstate commerce in violation of the Dormant Commerce Clause, and an injunction against the enforcement of those regulations to exclude out-of-state businesses from using the Property.

4.      An award of attorney's fees, costs, expenses, and pre- and post-judgment interest to the extent permitted by applicable law; and

5.      Any other relief permitted by applicable law or deemed appropriate by this Court.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Lumberjack demands a trial by jury on all triable issues.


BALLARD SPAHR LLP

DATED:  March 20, 2026          By: */s/ Bruce H. Cahn*
                                    Bruce H. Cahn, OSB No. 935450
                                    Nathanael Farris PA Bar No. 323059 (*pro hac vice* to be submitted)
                                    601 S.W. Second Avenue, Suite 2100
                                    Portland, OR 97204-3158
                                    Telephone: 503.778.2100
                                    cahnb@ballardspahr.com
                                    farrisn@ballardspahr.com

                                    *Of Attorneys for Plaintiff*


PAGE 36 – COMPLAINT